IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| 1899 HOLDINGS, LLC | : | |
| | : | |
| v. | : | Civil No. CCB-12-297 |
| | : | |
| 1899 LLC | : | |
| | : | |

**MEMORANDUM**

1899 Holdings, LLC ("Holdings"), Stanley Keyser, the Keyser Development Corporation ("KDC"), IMDBOSS, LLC, and several other entities sued 1899 LLC, Small Deal Fund, LP ("Small Deal"), 1899 Special Member, LLC, and Raleigh Consultants, LLC, alleging several counts of breach of contract and unjust enrichment associated with the redevelopment of a Baltimore property, among other claims. After full briefing and a hearing, the court dismissed the amended complaint in its entirety for failure to state a claim. The Court of Appeals affirmed that decision. The defendants now move for the attorney's fees and costs they have incurred in this litigation. That motion has been fully briefed, and no hearing is necessary to its resolution. *See* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, it will be granted.

**BACKGROUND**

This action arose out of efforts to redevelop the Northern District Police Station, now known as Hampden Village Centre, in Baltimore. (*See* Am. Compl. ¶ 1, ECF No. 21.) In 2001, the two original members of 1899 LLC—KDC and W.L. Blair Development, LLC ("W.L. Blair")—began redeveloping that property. (*See id.* ¶ 13.) As construction progressed, however, "numerous unforeseen difficulties . . . delayed and greatly increased the development costs of the

1

Project," straining the project participants' resources. (*Id.* ¶ 16.)  To secure financing, Stanley Keyser negotiated an agreement with John Bowman, Jr., the president of an investment firm. (*See id.* ¶ 18.)  That arrangement was memorialized in an operating agreement, dated January 31, 2006.  (*See id.* ¶ 19; Mot. Att'y Fees Ex. 1, Operating Agreement, ECF No. 59-1.)  Under the operating agreement, KDC and W.L. Blair withdrew from the project, Holdings was designated the "Managing Member" of 1899 LLC, and Small Deal was designated the "Investing Member" and invested capital in the project.  (*See* Am. Compl. ¶ 19; Operating Agreement §§ 2.01, 3.02.) On the same day the operating agreement was executed, Holdings, KDC, and Stanley Keyser executed a guaranty for the benefit of Small Deal.  (*See* Mot. Att'y Fees Ex. 2, Guaranty, ECF No. 59-2.)  Nearly two years later, Small Deal removed Holdings from 1899 LLC.  (*See* Am. Compl. ¶ 28.)

Years later, the plaintiffs filed this lawsuit in the Circuit Court for Baltimore City, alleging several claims of breach of contract and unjust enrichment, and seeking damages and an accounting.  (*See* Compl., ECF No. 2.)  The defendants removed the litigation to this court, (*see* Notice of Removal, ECF No. 1), and filed a motion to dismiss for failure to state a claim, (*see* Mot. to Dismiss, ECF No. 19).  The plaintiffs amended their complaint, (*see* Am. Compl.), and the defendants filed a second motion to dismiss, (*see* Mot. to Dismiss, ECF No. 27).  After a hearing on that motion, the court dismissed the complaint in its entirety.  (*See* Order, ECF No. 44.)  The plaintiffs timely appealed that order, which the Fourth Circuit affirmed on the merits. *1899 Holdings, LLC v. 1899 Limited Liability Co.*, 568 F. App'x 219 (4th Cir. 2014).

## ANALYSIS

The defendants argue that the operating agreement and guaranty require Holdings, KDC,

and Keyser to pay the reasonable attorney's fees and costs they incurred in successfully defending themselves in this litigation.[1] The plaintiffs do not deny that Holdings is responsible for those fees and costs. But they contest KDC and Keyser's liability, arguing that neither was subject to the fee-shifting provision included in the operating agreement. And they claim that the sum claimed by the defendants—$203,721.81—is unreasonable. As explained below, the guaranty obligates KDC and Keyser to pay any of Holdings' outstanding obligations under the operating agreement, including attorney's fees and costs. The amount the defendants request is largely justified; a modest reduction of five percent will be applied to the fee request as explained below.

**I. Obligations under the operating agreement and guaranty**

"Contract clauses that provide for the award of attorney's fees generally are valid and enforceable in Maryland, subject to a trial court's examination of the prevailing party's fee request for reasonableness." *Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 399–400 (Md. 2011) (quoting *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008)).[2] Such fee-shifting provisions are "strictly construed to avoid inferring duties that the parties did not intend to create," such that fees may be awarded "only . . . where . . . a contract between the parties *specifically* authorizes attorneys' fees." *Thomas v. Capital Med. Mgmt.*

---

[1] In the defendants' memorandum in support of their motion, they asserted that IMDBOSS was also obligated to pay their fees and costs. (*See* Mem. Supp. Mot. Att'y Fees 10, ECF No. 59.) In their reply, however, the defendants withdraw that assertion, agreeing with the plaintiffs that IMDBOSS is not liable. (*See* Reply Mot. Attorney's Fees 2 n.1, ECF No. 65.)

[2] Both parties assume that Maryland law applies to this question, relying largely on cases applying that state's law. In a diversity case such as this, state law governs the allocation of attorney's fees and costs. *See, e.g.*, *Ranger Constr. Co. v. Prince William Cnty. Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979). A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Maryland law, choice-of-law provisions in contracts are generally honored. *See, e.g.*, *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 469 (4th Cir. 2011) (applying Maryland law). Here, the operating agreement and the guaranty specify that they are governed by Maryland law. (*See* Operating Agreement §§ 2.10, 14.10; Guaranty ¶ 12.)

*Assocs., LLC*, 985 A.2d 51, 68 (Md. Ct. Spec. App. 2009) (omissions and emphasis in original) (internal quotation marks and citations omitted).

The operating agreement contains specific authorization to shift fees and costs to the prevailing party. It provides:

> The prevailing party (either the plaintiff or the defendant) in an action or proceeding brought to enforce the provisions of this Agreement shall be entitled to receive from the other party or parties the costs and expenses (including reasonable attorney's and accountant's fees) incurred by such party as a result of such action or proceeding.

(Operating Agreement § 14.14.) As noted, the plaintiffs do not contest that Holdings—which is a party to the operating agreement—owes fees and costs under this provision. Instead, the plaintiffs assert that KDC and Keyser owe no such fees or costs, because neither is party to the operating agreement.

That argument overlooks the effects of the guaranty, alongside of which the operating agreement must be read. *See Rocks v. Brosius*, 217 A.2d 531, 545 (Md. 1966) ("Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction."). Indeed, the guaranty—which, as noted, was signed the same day as the operating agreement—specified that Small Deal conditioned its investment and execution of the operating agreement on the "execution and delivery of this Guaranty . . . but for which the aforesaid investment would not be made . . . ." (Guaranty 1.) Under the guaranty, both KDC and Keyser promised to make any outstanding payment that Holdings failed to deliver. Specifically, it states:

> If the Managing Member fails to perform on a due and punctual basis any of the Managing Member Obligations, the Guarantors will from time to time provide such funds, if any, as are necessary to ensure full compliance therewith, including any compensation due to the Investor Member under the Operating Agreement for

4

damages resulting from noncompliance.

(Guaranty ¶ 2.) The guaranty defines the Managing Member as Holdings, the Guarantors as including KDC and Keyser, and the Investor Member as Small Deal. (*See id.* at 1.) Holdings' obligations include "all of its obligation under . . . the Amended and Restated Operating Agreement" signed on the same day as the guaranty. (*Id.* ¶ 1.) And the guaranty specifies that it "is of payment and not of collection," such that Small Deal need not sue Holdings for payment or seek out security before invoking the guaranty's protections. (*Id.* ¶ 3.) "If the Managing Member shall at any time fail to make any payment required to be made under the Operating Agreement as and when the same shall become due and payable, the Guarantors will make such payment or cause such payment to be made prior to the time the failure or delay in making such payment becomes an event of default." (*Id.*)

KDC and Keyser object that the separate fee-shifting provision in the guaranty, not the operating agreement, should control. That provision requires the guarantors to "pay on demand by the Investor Member any and all expenses (including, without limitation, reasonable attorneys' fees) incurred by the Investor Member in the enforcement of this Guaranty . . . ." (*Id.* ¶ 4.) The plaintiffs first argue that this provision has no application, because "Small Deal has never taken action to enforce the Guaranty against Keyser or KDC." (Opp. Mot. Att'y Fees 6, ECF No. 63.) Not so. This motion itself constitutes an effort to enforce the guaranty, and that agreement's fee-shifting provision requires the guarantors to cover the costs Small Deal incurred in preparing the motion.

KDC and Keyser next assert that the guaranty's fee-shifting provision is "more narrowly tailored" than the cognate provision in the operating agreement, and that this "more narrow

agreement must control." (*Id.* at 6.) True, "[w]here two clauses or parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." *Heist v. E. Sav. Bank, FSB*, 884 A.2d 1224, 1228 (Md. Ct. Spec. App. 2005) (alteration in original) (quoting *Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399, 407 (Md. 1975)). But that rule has no application where, as here, there is no conflict between two contractual provisions. The operating agreement outlines Holdings' obligations to pay certain costs. Meanwhile, the guaranty describes KDC and Keyser's obligations, which include performing certain of Holdings' duties when Holdings is in default, as well as paying costs associated with compelling KDC and Keyser to do so. Those obligations do not conflict; rather they complement one another.

KDC and Keyser assert that neither the operating agreement nor the guaranty "expressly obligates the guarantors to pay attorneys' fees in the circumstances present in this case," because the operating agreement's fee-shifting provision defined only the relationship between Holdings and Small Deal. (Opp. Mot. Att'y Fees 6.) The defendants' conclusion does not follow from that premise. Although the operating agreement defined only obligations between the Holdings and Small Deal, the guaranty required KDC and Keyser to cover Holdings' failure to honor those obligations. Accordingly, the interaction between the operating agreement and the guaranty confirms that KDC and Keyser are expressly required to pay Holdings' outstanding obligation.

Separately, the defendants argue that Holdings' obligations under the operating agreement ceased following its removal as managing member, so that "the Guaranty was no longer of any force or effect." (Opp. Mot. Att'y Fees 6.) The guaranty specifically precludes that argument. It provides that "this Guaranty shall remain and continue in full force and effect

as to and notwithstanding any amendment of the Operating agreement, . . . or removal of any Partner thereunder . . . ." (Guaranty ¶ 17.) To the extent the defendants assert that Holdings' performance of its obligation to pay attorney's fees under the operating agreement "became a legal impossibility" following its removal, (Opp. Mot. Att'y Fees 6), that argument sits in uneasy tension with the plaintiffs' unsuccessful efforts to enforce that selfsame agreement. The operating agreement's fee-shifting provision applies to "an action or proceeding brought to enforce the provisions of this Agreement." (Operating Agreement § 14.14.) Holdings can perform that obligation regardless of whether it has been removed as Managing Member. Although the operating agreement outlines specific limitations on Holdings' liability after its removal as a managing member in § 8.04, no release from the fee-shifting obligation is among those limitations. That omission precludes the plaintiffs' argument. Indeed, as the agreement expressly states, "[n]othing in this section 8.04(b) shall reduce or otherwise limit the rights, remedies or other actions available to the Investor Member against the removed Managing Member." (Operating Agreement § 8.04(b).)

Even if the guaranty required KDC and Keyser to cover Holdings' obligation to pay fees, the defendants continue, the plaintiffs have not complied with the procedural requirements on which the guaranty conditions enforcement of its provisions. According to the defendants, the guaranty requires notice "to Keyser and KDC within 10 days of Managing Members' failure to perform its obligations under the Operating Agreement." (Opp. Mot. Att'y Fees 6 n.4.) Because the defendants' "position throughout this litigation [was] that Holdings was not meeting its obligation in November, 2008," they argue that the time for notice of a claim "has long ago expired." (*Id.*) That argument is not consistent with the defendants' claim, which is for the

expenses they incurred in defending themselves from the plaintiffs' lawsuit, not compensation for Holdings' breach in 2008. Indeed, the defendants first moved for fees within 10 days after this court's order dismissing the plaintiffs' complaint, (*see* ECF No. 46), and they moved to modify the briefing schedule on that motion (with the plaintiffs' consent) seven days after issuance of the Court of Appeal's affirmation of that dismissal, (*see* ECF No. 56). The defendants thus have complied with the plaintiffs' interpretation of the guaranty.

Even were it otherwise, the language of the guaranty directly contradicts the plaintiffs' reading of it. The guaranty does not place a 10-day limitations period on any claim. To the contrary, it states: "Prior to filing any action against a Guarantor to enforce the guaranty made hereunder, the Investor Member shall first give the Managing Member and the Guarantor written notice and an opportunity to cure any failure to perform as required hereunder within 10 days." (Guaranty ¶ 4.) "[C]ourts ordinarily assume that 'a limiting clause or phrase . . . modif[ies] only the noun or phrase that it immediately follows.'" *In re Sanders*, 551 F.3d 397, 399 (6th Cir. 2008) (alteration in original) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). Here, the prepositional phrase "within 10 days" applies to the phrase immediately preceding it, meaning that Small Deal must give the guarantors and Holdings 10 days to cure any default before seeking to enforce the motion. Small Deal complied with that provision by sending on June 9—more than 10 days before filing its memorandum in support of its motion—a letter to the plaintiffs' counsel requesting the attorney's fees and costs it seeks in its motion. (*See* Mem. Supp. Mot. Att'y Fees Ex. 5, ECF No. 59-11.)

Finally, the plaintiffs assert that 1899 Special Member and Raleigh Consultants were never party to the operating agreement, and thus cannot enforce its fee-shifting provision. The

point is largely moot, insofar as the request for attorney's fees appears to be limited to those fees and expenses paid by Small Deal. (*See* Mot. Att'y Fees Ex. 3, Caiola Aff. ¶ 8, ECF No. 59-3.) As to Special Member, it replaced Holdings following Holdings' removal, pursuant to the operating agreement. (*See* Operating Agreement § 8.04(b); Am. Compl. ¶ 28.) Upon being designated the special member, that entity is "entitled to all of the rights and powers specified in this Agreement without any additional consents being required." (*See* Operating Agreement § 14.12(b).) Indeed, Holdings sued Special Member under that agreement, implying that Special Member was bound by it. (*See* Am. Compl. ¶ 66.) Special Member thus may enforce the operating agreement, including its fee-shifting provision. Nevertheless, the defendants do not affirmatively argue that either Special Member or 1899 LLC are beneficiaries of the guaranty and nothing in the record suggests that either entity may enforce that agreement. As to Raleigh Consultants, it merely served as a construction manager to the project, never entering into the operating agreement or the guaranty. (*See id.* ¶ 20.) It is thus not entitled to fees under either of those contracts.

Under the terms of the guaranty, then, Holdings, KDC, and Keyser are responsible for Holdings' outstanding payment of Small Deal's reasonable attorney's fees and costs.

**II. Reasonableness of requested fees and costs**

The defendants request $195,232.00 in fees and $8,489.81 in expenses. (*See* Reply Mot. Att'y Fees 1.) The plaintiffs, meanwhile, contest the reasonableness of that request, asserting that the time defendants' counsel expended on this matter is excessive in light of the alleged simplicity of the legal issues presented.

Under Maryland law, contractual fee-shifting provisions may permit no more than a

9

reasonable fee. *See, e.g.*, *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 7 A.3d 1, 5 (Md. 2010). In such circumstances, reasonableness is not evaluated by the lodestar method often used by courts to calculate reasonable fees under fee-shifting statutes. *Id.* at 7. Instead, "[c]ourts should use the factors set forth in Rule 1.5 [of the Maryland Lawyer's Rules of Professional Conduct] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Id.* at 8.[3]

As to the customary fee of defense counsel, Appendix B(3) of the Local Rules of the District of Maryland "provide[s] a presumptively reasonable range of hourly rates" for attorneys and paralegals with certain enumerated years of professional experience, *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md. 2000), which "may be referred to as a guide for determining reasonable hourly rates for state law claims," *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 514 n.8 (D. Md. 2005). The plaintiffs concede that the hourly rates charged by Paul Caiola, Brian Tucker, Steven Metzger, and Charlotte Hoffman for their services are

---

[3] Rule 1.5(a) lists the following eight considerations:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relation ship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Md. R. Prof'l Conduct 1.5(a).

reasonable, insofar as they are within the range of presumptively reasonable rates established by Appendix B. (Opp. Mot. Att'y Fees 9.) They note, however, that the rate charged by Peter Keith and Cynthia Eyler, a paralegal, are slightly greater than the rate outlined in the Appendix. Keith's rate exceeds the maximum presumptively reasonable figure by $10; Eyler's by $20. Those deviations from the presumptively reasonable rates are relatively insignificant. Keith spent under four hours on the case, largely preparing for and participating in a moot appellate argument. Eyler spent just over 34 hours on the case, largely in preparing this fee petition. In addition, an experienced Maryland attorney has reviewed the fee petition and submitted an affidavit stating that "[t]he rates are consistent with those customarily charged by law firms, attorneys, and other professionals with similar experience, competency and reputations in the prevailing Baltimore metropolitan market . . . ." (Mot. Att'y Fees Ex. 4, Maloney Aff. ¶ 5, ECF No. 59-10.) The court agrees with that assessment, notwithstanding the slight deviation from the presumptively reasonable rates.

As to the time required to defend the claims, the plaintiffs describe counsel's conduct as "excessive in comparison to the work performed and the relative simplicity of the legal issues involved." (Opp. Mot. Att'y Fees 10.) The plaintiffs first characterize the 17 hours spent researching and preparing a notice of removal as unreasonable, arguing that a maximum of five hours should have been devoted to that task. (*Id.* at 13.) As the defendants point out, however, that removal was premised on diversity jurisdiction, (*see* Notice of Removal), which required it to identify the citizenship of the members of each of the many limited liability companies implicated by this lawsuit, *see, e.g.*, *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004).

11

The plaintiffs next complain that the 85 hours spent preparing the defendants' initial motion to dismiss were excessive. That argument disregards the complexity of the plaintiffs' initial 23-count complaint (later reduced, via amendment), which sought on behalf of seven plaintiffs far more than $10 million from four defendants, and which was premised in part on the breach of a 92-page operating agreement (not including appendices and amendments) and the parties' progress on a project initiated in 2006. The defendants' grasp of that complex subject matter was sufficient to persuade the plaintiffs to alter their theories by amending their complaint, eliminating certain counts and adding, among other things, allegations of an oral agreement between Small Deal and Keyser. (*See* Am. Compl. ¶ 31.) In response, the defendants filed a second motion to dismiss, which required roughly 55 hours to prepare, as well as a reply to the plaintiffs' opposition, which the defendants produced in approximately 102 hours. The plaintiffs contend that such time was excessive, given that the second motion to dismiss was largely redundant of the first and that the reply was largely redundant of the initial memorandum in support of the motion. As to the second motion to dismiss, it was not entirely redundant of the first: the defendants substantially revised their argument that allegations regarded unpaid advances failed to state a claim, in light of additional details of the underlying transaction contained in the amended complaint. To the extent that the two filings *did* overlap, the scope of that duplication presumably accounts for the 35% reduction in the amount of time it took to prepare the second motion to dismiss. As to the reply, that filing was longer than either of the defendants' preceding memoranda, was supported by a greater body of case law, responded fully to the plaintiffs' opposition, and advanced arguments this court ultimately found persuasive. Specifically, the reply homed in on the chronology of alleged events, particularly the date of the

putative oral agreement, which predated ratification of the amended operating agreement and its integration clause. Nonetheless, the court agrees that the hours appear somewhat excessive given the time already spent on the two motions to dismiss.

The plaintiffs assert that the time spent preparing for the hearing on this case—roughly 26 hours—was excessive. Again, however, that position somewhat underestimates the complexity of this multi-defendant dispute and the stakes associated with a multi-million dollar prayer for relief. Further, the hearing was important to the court's decision.

The plaintiffs also describe the time spent on the appeal—which included 24 hours on administrative tasks and 112 hours in preparing a brief—as excessive, again emphasizing the alleged redundancy between the issues on appeal and those litigated before this court. But that alleged redundancy is not entirely probative. As the defendants point out, "a competent lawyer won't rely entirely on last year's, or even last month's research: Cases are decided, statutes are enacted; regulations are promulgated and amended. A lawyer also needs to get up to speed with the research previously performed. All this is duplication, of course, but it's *necessary* duplication; it is inherent in the process of litigating over time." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). In any case, the appeal presented new legal issues associated with alleged errors in this court's dismissal of the complaint, including the effects of plaintiffs' counsel's admission at the motions hearing and the court's interpretation of a particular clause of the operating agreement. *See 1899 Holdings, LLC*, 568 F. App'x at 225–26.

The plaintiffs also object to the 67 hours spent preparing the initial fee application, nearly two-thirds of which were occupied by Eyler's production of the spreadsheets appended as exhibits to the motion for fees. Eyler's time is reasonable. Her summary spreadsheet includes

13

55 pages worth of entries, while supplemental exhibits further divide the defendants' request by the stage in the proceeding. Moreover, delegating the task of preparing such exhibits to a paralegal saved the plaintiffs money by avoiding the more expensive labor of attorneys. As to time spent by the attorneys in this case in preparing the initial motion and memorandum in support of it, that time required reviewing substantial time records, exercising judgment in excising certain records, researching the underlying law, and presenting it to the court. The time the attorneys in this case spent on those tasks was not excessive.

While the plaintiffs did not identify any specific time entry as excessive, the court notes some overlap between the work done by attorneys Caiola, Tucker, and Metzger in drafting motions and preparing for oral arguments. As noted, the length of time spent on the reply memorandum also seemed somewhat disproportionate to the issues involved. On the other hand, the court appreciates the significant amount of money at stake and the fully successful result the attorneys obtained for their clients. An overall reduction of five percent as to the fees sought will adequately account for any unnecessary duplication of effort and still recognize the excellent work done by counsel for their clients.

As to costs, the plaintiffs contend that the defendants unreasonably incurred $23.63 in eDiscovery costs and $1,489.89 in outside photocopying of client documents on the ground that the case was dismissed before formal discovery had begun. Notably, however, the underlying project in this case began in 2001, and the defendants' participation in it dates to 2005. The court cannot conclude that extensive photocopying of client records, for the purpose of investigating the multiyear project in response to a multimillion dollar claim involving several plaintiffs and several defendants, is unreasonable.

Last, the plaintiffs object to over $6,000 in Westlaw charges. Because those charges are labelled "reply brief research" or "appeal brief," the plaintiffs contend that they are insufficiently detailed to permit evaluation of the reasonableness of those charges. "[M]inutely detailed records," however, are not necessary to support a fee petition. *Daly v. Hill*, 790 F.2d 1071, 1079 n.12 (4th Cir. 1986). As Appendix B(1)(b) of the local rules indicates, the labels associated with specific time entries must identify the phase of the litigation to which it relates, although additional detail is sometimes helpful. Here, it is sufficient to specify that certain electronic research was devoted to the preparation of, say, the motion to dismiss or the appellate brief. Plaintiffs add that no such electronic research should be permitted where, as here, the parties relied largely on "Maryland case law, which is available in the Maryland Reporters that most law firms, and certainly each local courthouse have available in their libraries free of charge." (Opp. Mot. Att'y Fees 10.) The local rules permit, however, permit recovery of costs for "computerized on-line research." Appendix B(4)(a). And for good reason: Such research is often more efficient than traveling to a library, locating, and photocopying relevant cases. The court will not second guess those decisions here.

Accordingly, the court concludes that the costs requested in this motion are reasonable.

## CONCLUSION

For the reasons stated above, the defendants' motion will be granted. The court will award to Small Deal attorney's fees in the amount of $185,470.40 and costs in the amount of $8,489.81.

A separate order follows.

| | |
|---|---|
| <u>October 27, 2015</u><br>Date | <u>            /s/            </u><br>Catherine C. Blake<br>United States District Judge |